IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| METRO READY MIX, INC. | : | |
| | : | |
| v. | : | Civil No. CCB-06-0538 |
| | : | |
| ESSROC CEMENT CORP. | : | |

## MEMORANDUM

Plaintiff Metro Ready Mix ("Metro") claims damages in a case arising out of contracts for the supply of cement. Metro initially filed a complaint in this court against Essroc Cement Corporation ("Essroc") alleging breach of contract and breach of warranty; subsequently it amended the complaint to add allegations of intentional misrepresentation, intentional concealment, negligence, and negligent misrepresentation and to seek punitive damages. Now pending is Essroc's motion to dismiss the added claims. The matter has been fully briefed and a hearing was held on April 6, 2007. For the reasons that follow, I will grant Essroc's motion to dismiss.

## BACKGROUND

Metro is a qualified MBE contractor in the business of supplying and placing ready mix concrete for construction jobs. (Am. Compl. at ¶ 3.) Cement is a necessary ingredient in order to mix concrete, and for the years leading up to and including 2004, Metro obtained much of its cement from Essroc. (*Id.* at ¶ 4.) In late 2004, Metro bid for, and was awarded, several large contracts for projects at Dulles International Airport, Johns Hopkins Bayview Hospital, and Johns Hopkins University, all requiring high-strength concrete. At unclear times between November 2004 and March 2005, Metro and Essroc allegedly contracted for the delivery of

1

cement sufficient to cover Metro's needs for these projects.[1] (*Id.* at ¶¶ 4, 5, 7, 27.)  In December 2004 and January 2005, Metro, using cement supplied by Essroc, created concrete mix designs for its large projects.  (*Id.* at ¶ 6.)  These mix designs received approval from the contractors and from independent testing agencies, certifying that the concrete met strength and other testing requirements.  (*Id.*)

Metro used the cement it purchased from Essroc to manufacture concrete, which it then sold to construction companies for use in dormitories, parking garages, and tunnels.  (*Id*. at ¶ 10.)  Beginning in May 2005, Metro began to receive complaints about the strength of its concrete.  (*Id*. at ¶ 15.)  In December 2005 and January 2006, Metro had its concrete tested, and the tests revealed that the cement supplied by Essroc was defective.  (*Id.* at ¶ 16.)  As a result of the defective cement, Metro alleges that its customers began terminating their contracts and charging Metro for remedial costs caused by the problematic concrete.  (*Id*. at ¶ 17.)  Because of the terminated contracts, Metro had to sell off some equipment at a loss, and pay for the cancellation of other leased equipment.  (*Id.* at ¶ 19.)  Apparently Metro has since been forced to close its business.

The initial complaint, filed in March 2006, alleged that Essroc breached the contract between the parties and the accompanying warranty of merchantability.  (Compl. at ¶¶ 14, 18.)  Essroc answered and counterclaimed in March 2006.  Metro now alleges that Essroc made misrepresentations inducing Metro to contract with Essroc.  Metro representatives met with Essroc representatives in the fall of 2004 and early 2005.  (Pl.'s Opp. Mem., Sneska Dep. at 197, 199.)  At these meetings, Metro alleges that Essroc stated it could provide Metro with the quality

---

[1]  Because the contracts were oral, they are not attached to the pleadings as evidence.

and quantity of cement it needed.  (*Id.*; Gupta Aff. at ¶¶ 5-6.; McGinty Aff. at ¶¶ 5-7.)  Metro alleges that when Essroc made these assurances, however, it knew it was not capable of providing safe and suitable cement.

Metro argues discovery revealed Essroc's cement was defective in several areas throughout 2005.  For instance, Essroc missed the target for the chemistry of its cement slurry at times during 2005 and 2006.  (*See id.*; Exs. 3-5, 2005 Annual Data; Jensen Dep. at 214-15; Ex. 12, ISO chart, Apr. 27, 2006.)  Metro also alleges several other problems with Essroc's cement, including the condition of clinker particles in the cement, as indicated by several loss-on-ignition tests (*See id*, Ex. 15, 2005 Daily Quality Control Sheets), the coarseness of the cement (*See id.*, Ex. 16, Control Lab Reports), the size of the cement particles (*See id.*, Ex. 3-5), the chemistry of the cement (*See id.*), the setting time for the cement (*See id.*), and the strength of the cement (*See id.*).  These lab reports and quality control documents were prepared from data collected throughout 2005 and 2006.

After receiving the test results and deposing Essroc witnesses, Metro amended its complaint to include claims for intentional misrepresentation, intentional concealment, negligence, and negligent misrepresentation.  Metro alleged that Essroc's two main plants were experiencing severe maintenance and quality control problems in the spring of 2005, which brought Essroc's cement in violation of the standards for cement manufacturing established by the American Society for Testing and Materials (ASTM).  (*Id*. at ¶¶ 11-12.)  In its intentional misrepresentation claims (counts III and IV), Metro alleges that in 2004 and February 2005, Essroc falsely represented that it was capable of supplying Metro with suitable cement that would meet ASTM standards, and did so "with actual malice, ill will, and spite towards Metro.".

In its intentional concealment claim (count V), Metro alleges that Essroc knew and did not disclose the problems at its manufacturing plants.  In its negligence claim (count VI), Metro alleges that Essroc had a duty to exercise ordinary care in the production of cement, and breached that duty by selling substandard cement.  Lastly, in its negligent misrepresentation claim (count VII), Metro alleges that Essroc falsely represented that the cement would be safe and suitable for Metro's needs.  As noted, Essroc has moved to dismiss the added claims.

## ANALYSIS

"The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint; importantly, a Rule 12(b)(6) motion does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks and alterations omitted).  When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff."  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  Consequently, a motion to dismiss under Rule 12(b)(6) may be granted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Edwards*, 178 F.3d at 244.  To survive a motion to dismiss, however, a complaint must "in light of the nature of the action . . . sufficiently allege each element of the cause of action so as to inform the opposing party of the claim and its general basis."  *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 348 (4th Cir. 2005).  In addition, because the court is testing the legal sufficiency of the claims, the court is not bound by the plaintiff's legal conclusions.  *See*, *e.g.*, *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001)

(noting that the "presence . . . of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6)" when the facts alleged do not support the legal conclusions).

### 1. Fraud

Essroc maintains that Metro has failed to allege fraud with sufficient particularity under Fed. R. Civ. P. 9(b). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." *See* Fed. R. Civ. P. 9(b). Thus, a plaintiff alleging fraud must make specific allegations regarding matters such as "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation, and what [was] obtained thereby." *Kerby v. Mortgage Funding Corp.*, 992 F.Supp. 787, 799 (D. Md. 1998) (*quoting Windsor Assoc. Inc. v. Greenfeld*, 564 F. Supp. 273, 280 (D. Md. 1983)); *see also Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 249-50 (D. Md. 2000). Failure to comply with the pleading requirements of Rule 9(b) is treated as a failure to state a claim under Rule 12(b)(6). See *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n. 5 (4th Cir. 1999).

The elements of fraud in Maryland are well-established: 1) the defendant made a false representation to the plaintiff, 2) its falsity was either known to the defendant or the representation was made with reckless indifference as to its truth, 3) the misrepresentation was made for the purpose of defrauding the plaintiff, 4) the plaintiff relied on the misrepresentation and had the right to rely upon it, and 5) the plaintiff suffered compensable injury resulting from the misrepresentation." *See, e.g., Hoffman v. Stamper*, 385 Md. 1, 28, 867 A.2d 276 (2005). The elements of fraudulent concealment are similar: 1) the defendant owed a duty to the plaintiff to

disclose a material fact; 2) the defendant failed to disclose that fact; 3) the defendant intended to defraud or deceive the plaintiff; 4) the plaintiff took action in justifiable reliance on the concealment; and 5) the plaintiff suffered damages as a result of the defendant's concealment. *Id.* at 28 n. 12.

The mere failure of promised performance does not, in and of itself, convert a breach of contract claim into a claim for fraud. *See, e.g.*, *Kwang Dong Pharmaceutical Co. v. Han*, 205 F. Supp. 2d 489, 495 (D. Md. 2002). Where a plaintiff can show, however, that a defendant made a promise as to a matter material to a bargain with no intention to fulfill it, an action for fraudulent misrepresentation may lie. *See McKenzie v. Comcast Cable Comm. Inc.*, 393 F. Supp. 2d 362, 374 (D. Md. 2005); *Gross v. Sussex Inc.*, 332 Md. 247, 258-59, 630 A.2d 1156 (1993). Thus, while "[o]rdinarily fraud cannot be predicated on statements which are promissory in nature, ... a deliberate misrepresentation of one's existing intentions, where the misrepresentation is material, may form the basis for an action in fraud or deceit." *McKenzie*, 393 F. Supp. 2d at 374 (internal quotations and citations omitted). Where a fraud claim, however, contains nothing more than an "assertion that [defendant] had no intention of honoring the contracts at the time they were entered," a claim for fraud cannot be sustained. *Han*, 205 F. Supp. 2d at 495.

Metro has not alleged or proffered facts to establish that Essroc knew its promise to fulfill the contract was false at the time the promise was made. In claiming that Essroc falsely represented it could produce suitable concrete, Metro relies heavily on Essroc's internal testing documents. These tests, however, were performed in 2005 and 2006, and not in 2004 or early 2005, when the contracts were entered into. (*See* Pl.'s Opp. Mem. at Exs. 3, 4, 5, 15, and 16.) While these tests appear to show Essroc's cement manufacturing process had some serious

problems beginning in the middle of 2005, they do not illustrate Essroc's state of knowledge in late 2004 or early 2005.  Indeed, Metro acknowledges that Essroc provided Metro with acceptable concrete in December 2004 and January 2005, indicating that both parties believed Essroc was capable of delivering suitable concrete at the time of the formation of the contract. (Am. Compl. at ¶ 6.)

The only piece of evidence Metro cites concerning Essroc's state of knowledge in late 2004 and early 2005 are ten customer complaints received by Essroc in 2004.  The plaintiffs do not dispute, however, that the majority of these complaints do not concern the type of cement involved in this lawsuit.  A few generalized complaints in 2004 are not sufficient to impute knowledge to Essroc that its cement was unsuitable for sale, especially given that Metro's concrete, using Essroc-supplied cement, received certification from independent testing agencies in December 2004 and January 2005.  (Am. Compl. at ¶ 6.)  While some Essroc employees were aware of problems in Essroc's manufacturing in 2005 (*see* Jensen Dep. at 129-31; Sneska Dep. at 234), there appears to be no specific evidence or allegation that Essroc did not believe it could fulfill the contracts at the time they were entered or that it was attempting to deceive or defraud Metro with its representations.  *See Hale Trucks of Md. v. Volvo Trucks of North Am., Inc.*, 224 F. Supp. 2d 1010, 1032 (court entered summary judgment in favor of defendant when plaintiff proffered no evidence that defendant had no intention of fulfilling contract).  Accordingly, Metro's claims for fraudulent misrepresentation and fraudulent concealment will be dismissed for failure to meet the specificity requirements of Rule 9(b) and, because Metro did not proffer in its opposition or at the hearing any evidence that would support these claims, no further leave to amend will be granted.

### 2.     Negligence and Negligent Misrepresentation

Metro's claims for negligence and negligent misrepresentation are based on Essroc's statements that it would be able to provide Metro with sufficient suitable concrete and its subsequent failure to do so.  Metro argues "[w]hen Essroc gave Metro its assurances that it would supply Metro with cement for the Projects, Essroc undertook a special relationship and had a duty of care to make sure those assurances were reasonable."  (Pl.'s Opp. Mem. at 25.)  Metro further contends that Essroc knew Metro was planning on using the cement for high-strength concrete purposes, and that successful fulfillment of the contract was very important economically to Metro.  The issue presented is whether Essroc owed a duty of care to Metro that allows Metro to maintain claims for negligence and negligent misrepresentation.

Maryland courts have held that tort duties may arise out of contractual relationships under certain circumstances.  In *Jacques v. First National Bank*, 307 Md. 527, 534-35, 515 A.2d 756 (1986), the court found "if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found ...", but suggested that tort duties could flow out of relationships where parties had an "intimate nexus," which may include contractual privity.  *Cf. Parker v. Columbia Bank*, 91 Md. App. 346, 374, 604 A.2d 521 (1992); *see also Giannaris v. Cheng*, 219 F. Supp. 2d 687, 695 (2002) (holding that an owner of a business had a duty to tell the truth in negotiations about proposed investment and plaintiff's employment in the business); *Weisman v. Connors*, 312 Md. 428, 443-48, 540 A.2d 783 (1988) (holding the owner of a business owed a duty of care to an employee it was signing to a long-term employment contract when it lured that employee away from an existing employment relationship); *Giant Food, Inc. v. Ice King, Inc.*, 74 Md. App. 183, 190-191, 536 A.2d 1182 (1988) (holding that,

8

where no contract was entered into, a grocery store had a duty to provide correct information about its intentions to use plaintiff's services when it knew that plaintiff was relying on that information to invest in expanding plaintiff's business); *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 337, 439 A.2d 534 (1982) (seller of a car dealership was found to have a duty not to misrepresent the financial condition of the dealership in a contract for the sale of the business).

On the other hand, courts in this district have attempted to limit remedies to contract law where the loss is purely economic and the parties engaged in arms-length commercial bargaining, particularly in connection with contracts for the sale of goods. *See, e.g., Rotorex Co., Inc. v. Kingsbury Co.*, 42 F. Supp. 2d 563, 575 (D. Md. 1999) (holding that negligence and negligent misrepresentation claims be dismissed in contract for design and manufacture of automated assembly system); *Blue Circle Atlantic v. Falcon Materials, Inc.*, 760 F. Supp. 516, 519 (D. Md. 1991) (dismissing purchaser of cement's negligent misrepresentation claims where the losses were purely economic); *21st Century Properties Co. v. Carpenter Insulation and Coatings Co.*, 694 F. Supp. 148, 151 (D. Md. 1988) (imposing no tort duty under contract for the sale and installation of foam roofs); *Flow Indus., Inc. v. Fields Constr. Co.*, 683 F. Supp. 527, 530 (D. Md. 1988) (imposing no duty under contract between general and subcontractor for delivery of pump motors). The courts have further been wary of allowing negligent misrepresentation claims to survive where remedies under contract law are sufficient to cover the plaintiff's injuries,. *See, e.g., Boatel Indus., Inc. v. Hester*, 77 Md. App. 284, 307-08, 550 A.2d 389 (1988) (declining to decide whether a duty in negligent misrepresentation claim extends to yacht seller's claims about quality of product where the damages "are included within the damages recoverable under the warranty counts").

Because application of the somewhat uncertain contours of Maryland law to this case may be assisted by further factual development, and discovery will be proceeding on the contract claims in any event, the defendant's motion to dismiss the negligence and negligent misrepresentation claims will be denied, subject to renewal if warranted as a summary judgment motion at the close of discovery.

Lastly, I note that Metro has not alleged facts to show that Essroc acted with "actual malice," thus precluding the award of punitive damages. *See Biktasheva v. Red Square Sports, Inc.*, 366 F. Supp. 2d 289, 295 (D. Md. 2005) (citing *Montgomery Ward v. Wilson*, 339 Md. 701, 664 A.2d 916, 930 n. 5 (1995)).[2]

A separate order follows.

   April 25, 2007                                                                             /s/
        Date                                                      Catherine C. Blake
                                                               United States District Judge

---

[2] The reasoning in *Mid-Atlantic Chemicals Corp. v. Shaw Indus, Inc.*, an opinion cited by both parties, also supports this result. *Mid-Atlantic Chemicals Corp. v. Shaw Indus, Inc.*, 2006 WL 174256 (D. Md.) (unreported) (finding a lack of a malice and dismissing claims for fraud and punitive damages, where plaintiff alleged both parties believed the defendant's products were in compliance at the beginning of the contractual relationship).